IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MICHAEL A. ROSE,<br><br>                    Petitioner,<br><br>          vs.<br><br>KELLY SANTORO, Warden, North Kern State Prison,[1]<br><br>                    Respondent. | No. 2:13-cv-02416-JKS<br><br>MEMORANDUM DECISION |

Michael A. Rose, a state prisoner represented by counsel, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Rose is in the custody of the California Department of Corrections and incarcerated at North Kern State Prison. Respondent has answered, and Rose has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

On November 15, 2007, Rose was charged with attempted murder (count 1), assault with a deadly weapon (count 2), first-degree burglary (count 3), two counts of exhibiting a deadly weapon for a street gang (counts 4 and 6), two counts of forcible false imprisonment (counts 5 and 7), and criminal street gang activity (count 8) in connection with the beating of Maciej Krupa. With respect to count 1, the information alleged that the attempted murder was willful, deliberate, and premeditated. As to counts 2 and 3, it alleged that Rose personally inflicted great injury. A criminal street gang enhancement was also attached to counts 1, 2, 3, 5, and 7, and a

---

[1]          Kelly Santoro, Warden, North Kern State Prison, is substituted for Randy Grounds, former Warden, Salinas Valley State Prison. FED. R. CIV. P. 25(c).

hate-crime enhancement was alleged as to counts 1, 2, and 3.  The information also alleged that

Rose's 1998 arson conviction was a "strike," a serious felony conviction, and a prior prison term

enhancement.  On direct appeal of his conviction, the Court of Appeal recounted the following

facts underlying the charges against Rose:

> Defendant Michael Allen Rose has a "White Power Skinhead" tattoo on the back of his head, Nordic runes on his neck, and a tattoo of boots with a crucified skinhead on his arm.  He teamed with a "shot caller" for the United Society of Aryan Skinheads (USAS) in Northern California in assaulting a presumed enemy of the neo-Nazi skinhead faction.  He was on the run for two years following the brutal assault before being charged . . . .
> . . .
> The perpetrators, victim, and witnesses were all participants in the skinhead movement to varying degrees.  Thus, to acquaint the jury with the context in which the crimes occurred, the prosecution's gang expert on neo-Nazi skinheads provided a basic tutorial on skinhead culture, sociology, and psychology in Northern California.  Moreover, his testimony, coupled with the testimony of the skinhead witnesses, provided more than sufficient evidence that the crimes and enhancements were gang related; indeed, that they were committed for the benefit of the neo-Nazi skinhead criminal street gang USAS.
>
> By all accounts, the skinheads can be divided into three groups: traditional, working class skinheads; skinheads against racial prejudice (SHARP); and white power, neo-Nazi skinheads.  Traditional skinheads do not advocate violence or hatred and, according to the expert, do not constitute a criminal street gang because they lack structure, they lack organization, and they lack a pattern of criminal behavior.  The only similarity they share with the other skinheads is their attire.  All three groups traditionally wear Dr. Martens-brand boots; tight, rolled-up Levi's jeans; braces or spaghetti-strap suspenders; and an alpha flight jacket or Levi's jean jacket.  They often sport either very short hair or shaved heads.
>
> SHARP's and neo-Nazi skinheads are enemies because the SHARP's are opposed to racism.  SHARP's are skinheads in name, but their political agenda is the polar opposite of the neo-Nazis, and their membership includes not only Caucasians, but people of color.  Neo-Nazi skinheads, by contrast, are fiercely committed to the 14 words of their mythical hero, David Lane: "We must secure the existence of our people for the future of white children."  They believe "that if they commit attacks on enemies, that they'll be able to free the United States of its alien invaders, Mexican immigrants, that they'll be able to send African Americans back to their ancestral lands.  They'll be able to serve the power structure of the United States government which is corrupted from Zionist, occupational governments in Israel."  Subsets, such as USAS, subscribe to a very pure political doctrine to unify all skinhead gang members or, in their vernacular, "to

forge a cadre of Skinhead warriors." They absolutely will use violence, including bloodshed, to achieve their purpose of exterminating their enemies.

Sean Gray, Ryan Rocha, and victim Maciej Krupa dabbled in the skinhead movement. Naïve about the political and practical consequences of wearing an anti-Nazi slogan, 16-year-old Krupa wore a T-shirt proclaiming "Nazi punk, fuck off" in the presence of USAS shot caller Chris Vochatzer. Vochatzer called him a SHARP, ordered him to take off the shirt, and then burned it. Krupa's youthful indiscretion apparently precipitated the beating he received in this case seven years later.

As mentioned at the outset, all the percipient witnesses were skinheads at one time or another. [Rose] challenged the credibility of the prosecution's two key witnesses, Tim Johnston and Ryan Rocha, and the prosecutor challenged the credibility of Chris Vochatzer, incarcerated as a validated member of USAS and the admitted perpetrator of the beating of Krupa with a baseball bat. These witnesses gave the following accounts of what happened on the night of April 4, 2005.

Ryan Rocha met Vochatzer and [Rose] at a "Battle of the Bands" in Davis a few days before the beating. Vochatzer told Rocha that Krupa was a SHARP, and if he ever saw him again, he would beat him up. On April 4, Rocha passed on the threat to Krupa, who had been drinking and who was anxious to resolve this lingering dispute with Vochatzer. Rocha called Johnston, who was en route to Santa Rosa with another skinhead, Chad Quayle, and Quayle's girlfriend. Eventually Krupa also talked to Johnston, and they decided Vochatzer, Johnston, and Quayle would come over to Krupa's Davis apartment.

Tim Johnston had met Krupa at the Kentucky Fried Chicken restaurant Krupa managed in Davis. Johnston, then about 17 years old, was on probation for threatening his father with a gun. He was covered in neo-Nazi tattoos. He spent nearly a year in juvenile hall facing a life sentence for his participation in the beating before he decided to assist the prosecution. He gave a tearful confession with the promise that nothing he said would be used against him in his trial but without any guarantee of a deal. But he was released and his case was dismissed within a few days of offering to cooperate with the prosecution and of naming [Rose] as a perpetrator.

Johnston and Rocha gave similar accounts of what transpired in the apartment, with one major exception: Johnston testified that [Rose] struck Krupa with a pipe a couple of times, and Rocha testified that [Rose] had threatened him and Sean Gray with the pipe, but he did not see him hit Krupa. Both testified that Vochatzer, [Rose], Johnston, and a fourth person, whom Johnston identified as Quayle, entered the apartment; Johnston testified that Vochatzer identified Krupa, called him a "mother fucking SHARP," and beat him with a baseball bat. Both had dropped out of the skinhead movement by the time of trial. Johnston added that the foursome had rendezvoused in Woodland, then drove to Davis in two vehicles, and [Rose] had instructed one of the female drivers to remain in the car.

Rocha did not disclose [Rose]'s name to the police during the initial investigation. Later, he identified him in a photo lineup in which [Rose] was the only suspect with tattoos on his neck but declared he was only 50 percent certain the other assailant was

[Rose].  At trial, he identified [Rose] and assured the jury he was 100 percent positive [Rose] was one of the intruders on the night of the beating.

Krupa was unable to identify anyone.  He recognized [Rose] but could not say from where.  The two men who first approached him during the attack had tattoos on their necks, and one of them might have been [Rose].  He described the severity of his injuries, his lengthy hospitalization, and the residual loss of use of his hand.

Called by the defense, Vochatzer admitted he was guilty of assaulting Krupa and is serving a 28-year prison term.  He is a proud member of USAS.  He testified he had fired [Rose] as a tattoo artist in his tattoo shop three weeks before the beating, but they remained good friends.  He insisted that [Rose] did not accompany him to Krupa's apartment, did not take part in the beating, and was not a neo-Nazi skinhead.  He refused to answer the prosecution's questions about anyone else.

The gang expert further testified about Vochatzer and [Rose's] gang affiliation.  He noted that skinheads are savvy about the legal consequences of belonging to criminal street gangs.  As a result, they do not consider themselves a gang, and they avoid the common trappings such as gang monikers.  They tend to operate as "lone wol[ves]," independent of an espoused gang, and they consider themselves "political activists."  Nevertheless, the primary activities of neo-Nazi skinheads are felony assault, assault with a deadly weapon, and attempted murder.  He based his opinion on the present case and a 2004 case from Santa Rosa in which a USAS skinhead, Jason Signs, slashed another person with a knife.

The expert opined that Vochatzer was a validated USAS member, and as a result of the assault on Krupa, he pled guilty to assault with a deadly weapon and criminal street gang activity.  He also opined that [Rose] was a neo-Nazi gang member, and assuming he was an active participant in the assault on Krupa, he would gain respect, even as an independent white power skinhead.  USAS clearly benefitted from the assault.

*People v. Rose*, No. C059910, 2010 WL 3048546, *1-3 (Cal. Ct. App. Aug. 5, 2010).

On February 26, 2008, Rose proceeded to jury trial.  A jury was selected and evidence was presented.  At the conclusion of evidence, the hate crime enhancements attached to counts 1, 2, and 3 were dismissed on a defense motion.  Arguments were then presented, and the jury was instructed.  On March 14, 2008, the jury returned its verdicts.  The jury acquitted Rose of count 1 (attempted murder), but found him guilty of all other counts (assault with a deadly weapon, first-degree burglary, two counts of exhibiting a deadly weapon for a street gang, two counts of forcible false imprisonment, and criminal street gang activity).  The jury also found the gang enhancements to be true, but found untrue the allegations that Rose personally inflicted great

injury.  Rose waived his right to a jury trial on the prior conviction, and the trial court

subsequently found true the prior conviction enhancements.

Roughly a month after the jury's verdict had been received, the trial court informed the

parties that the clerk had received a telephone call from the presiding juror ("Presiding Juror")

who indicated that she might know one of the parties that was named during the trial.  The court

and counsel agreed to hold a hearing at which the juror would testify.

On April 25, 2008, Presiding Juror testified that during trial she heard someone mention

the name "Jenny McNaughton" as someone who was or had been associated with Rose, likely as

a current or former girlfriend.  After she realized that she worked with someone whose maiden

name was McNaughton, Presiding Juror called the coworker, Ashley Nicholson, about a work-

related matter and also asked if Jenny McNaughton was her sister.  After Nicholson replied

affirmatively, Presiding Juror asked if her sister had a boyfriend, a baby, or drove an SUV;

Nicholson said "no."  Nicholson then asked if her sister was in trouble, and Presiding Juror

replied, "No.  I don't think she was there."  Nicholson then said, "My sister tends to get involved

with the wrong people," to which Presiding Juror replied, "Well, I understand that."  The

conversation then ended.  Presiding Juror testified:

> [I]n my mind, because Jenny didn't have a baby, didn't have a boyfriend, didn't
> drive an SUV, she wasn't involved or is no longer, so I just dismissed it, thinking it has
> no bearing on this case.
> I know there is [sic] guys in my past who have done things that I wouldn't want
> brought up so it has no bearing, so I completely dismissed the phone conversation, came
> to court on Friday, hearing closing arguments, went into deliberations and never thought
> about it again.

Presiding Juror further testified that, when she went into deliberations, she did not

believe that anyone mentioned at trial was related to her coworker.

A few days later, Nicholson told Presiding Juror that she had lied: her sister had a baby with Rose. Presiding Juror told Nicholson, "Oh, I wish you had said that on Thursday." Presiding Juror then agreed to Nicholson's request that she speak with the defense investigator. The defense investigator interviewed Presiding Juror, and she told him about her phone conversation with Nicholson and that she "truly dismissed the conversation after [they] hung up." Nicholson later approached Presiding Juror at work and said, "The investigator called me and said our stories don't match up and if you don't call him and come clean with what really happened, he is going to subpoena you into court." After seeking advice from an attorney, Presiding Juror then called the court.

Rose filed a new trial motion, which was supported by declarations from Nicholson and her mother. Nicholson's declaration averred that Presiding Juror first initiated a conversation with Nicholson about her jury duty service on March 3, 2008, while the two were in the break room. On March 13, 2008, Nicholson received a phone call from Presiding Juror asking about her sister, and Nicholson confirmed that Jennifer McNaughton was her sister, but denied that McNaughton had a son. Presiding Juror told Nicholson that she had "'researched' the name Jennifer McNaughton" and that there were other individuals in the area with that name, but Nicholson told her "of course it is my sister." Nicholson's affidavit further states:

> [Presiding Juror] said that the DA had asked a witness twice about Jennifer McNaughton and about her being at the scene of the incident. I told [Presiding Juror] that I was getting really worried about my sister and their conversation. [Presiding Juror] stated that my sister was not in any trouble and that the witness who mentioned her sisters [sic] name while testifying, had stated that Jennifer was not there when the incident happened. [Presiding Juror] then asked if Jennifer had a boyfriend. I told her not now and [Presiding Juror] asked if she had one a year or two ago. I stated that Jennifer had a boyfriend a year or so ago and [Presiding Juror] said yea that would be about right. [Presiding Juror] asked me if I remembered what he looked like and I said not really, I think he had a shaved head and tattoos. [Presiding Juror] asked me what

kind of car Jenny drove.  I told her it was a smaller black car.  She asked if she had a [sic] SUV.  I told her that she use[d] to drive black SUV but not anymore.

.... [Presiding Juror] told me that she was sorry for stressing me out and that she really should not be talking about it anyway.  [Presiding Juror] stated that since she had heard Jennifer's name during the trial she had not been able to focus on the case and all she could thin[k] about was if the Jennifer mentioned was the witnesses [sic] sister.

Several days later, Presiding Juror again discussed the case with Nicholson, who confirmed that Jennifer has a son with Rose.  The declaration from Nicholson's mother essentially repeats the contents of Nicholson's declaration based on her conversations with Nicholson after Nicholson's interactions with Presiding Juror.

The court heard oral arguments on the motion, after which, it denied the motion on the basis that the misconduct was harmless.  The court agreed with the defense that there "is technically misconduct" and Presiding Juror "should not have had the conversation she had." The court nonetheless concluded that "it was in a sense of harmless error" and found no good cause for a new trial.

The trial court subsequently sentenced Rose to a total imprisonment term of 30 years. The sentence on count 2 was stayed pursuant to California Penal Code § 654,[2] and he was sentenced to 6 years (doubled to 12 because of the prior strike conviction) on count 3. Consecutive sentences of 14 months were imposed on each of the remaining counts (counts 4-8). The court also imposed a consecutive 5-year term for the gang enhancement attached to count 3. For the gang enhancements attached to counts 5 and 7, the court imposed consecutive terms of 8

---

[2]     Section 654 provides in relevant part that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  CAL. PENAL CODE § 654.

months.  Finally, the court imposed a consecutive 5-year term for the prior serious felony enhancement.

Through counsel, Rose appealed his conviction, arguing that there was insufficient evidence to support the gang-related offenses and enhancements, the trial court should have suppressed on *Miranda* grounds Rose's statement to law enforcement; juror misconduct prejudiced his case and warranted reversal of his conviction, and the trial court improperly sentenced him.  On August 5, 2010, the California Court of Appeal issued a reasoned, unpublished opinion modifying Rose's judgment to stay the sentences imposed on counts 4 and 6, but affirming the judgment in all other respects.  *Rose*, 2010 WL 3048546, at *10.  Rose sought rehearing on his claim that there was insufficient evidence that the USAS skinheads are a criminal street gang, which was summarily denied on August 16, 2010.  Counsel for Rose then petitioned the California Supreme Court for review of Rose's claim that insufficient evidence supported the gang-related offenses and enhancements.  The supreme court denied the petition without comment on November 17, 2010.

Rose also filed in the California Superior Court two counseled petitions for a writ of habeas corpus.  The first alleged that trial counsel was ineffective for failing to move to exclude Rocha's identification on the ground that it was the result of an unduly suggestive lineup procedure.  The superior court found no prejudice, concluding that "[e]ven if evidence relating to the photographic lineup had been excluded, there remains sufficient evidence to support the judgment."  In the second habeas petition, Rose asserted that Presiding Juror concealed during voir dire that she was a victim of rape, and trial counsel was ineffective for failing to raise that claim.  He also again argued in the habeas petition that Presiding Juror's outside investigation

and discussion of the case with non-jury members warranted reversal.  Finally, Rose contended

that trial counsel was ineffective with respect to the identification issue.  The superior court

summarily denied the second habeas petition on January 10, 2013.  Rose also filed two

counseled habeas petitions in the Court of Appeal, alleging the same claims he raised before the

superior court.  Those petitions were likewise denied without comment.  He likewise raised those

claims before the Supreme Court in two additional counseled habeas petitions, which were both

summarily denied.

Rose timely filed a counseled Petition for a Writ of Habeas Corpus to this Court on

November 20, 2013.

## II. GROUNDS RAISED

In his counseled Petition before this Court, Rose raises two grounds for relief.  First, he

argues that Presiding Juror committed misconduct by failing to disclose that she had been the

victim of a violent sexual assault and by performing outside investigation and discussing the case

with non-jury members.  He additionally contends that his trial counsel was ineffective for not

moving to exclude the photographic lineup and failing to introduce at trial a recent photograph of

Quayle which showed that he and Rose had similar neck tattoos.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"

§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  Here, the last decision was a summary denial by the California Supreme Court on habeas review, which is an adjudication on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.    *Juror Bias/Misconduct (Ground 1)*

Rose first argues that he was denied his right to a fair trial because the jury foreperson did not disclose that she had been the victim of a violent sexual assault and committed misconduct by contacting Nicholson and doing outside research on the case.

The Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998).  While "[d]oubts regarding bias must be resolved against the juror," *United States v. Martinez-Martinez*, 369 F.3d 1076, 1082 (9th Cir. 2004), a defendant "bears the burden of showing that a juror was actually biased against him or her and that the district court abused its discretion or committed manifest error when it failed to excuse the juror for cause," *United States v. Hanley*, 190 F.3d 1017, 1030 (9th Cir. 1999) (internal quotation marks and alteration omitted).  "If only one juror is unduly biased or prejudiced or

improperly influenced, the criminal defendant is denied his Sixth Amendment right to an impartial panel." *United States v. Hendrix*, 549 F.2d 1225, 1227 (9th Cir. 1977).

Similarly, due process requires that a criminal defendant be tried by "a jury capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982); *Estrada v. Scribner*, 512 F.3d 1227, 1238 (9th Cir. 2008); *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986) ("Jurors have a duty to consider only the evidence which is presented to them in open court."). The introduction of prejudicial extraneous influences into the jury room constitutes misconduct which may result in the reversal of a conviction. *Parker v. Gladden*, 385 U.S. 363, 364-65 (1966). Habeas relief is warranted, however, only where it is reasonably likely that the petitioner would have obtained a better outcome if the misconduct had not occurred. *See Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (constitutional trial errors do not warrant habeas relief unless they have substantial and injurious impact on the jury's verdict or trial proceedings). The following factors are relevant to determining whether the alleged introduction of extrinsic evidence constitutes reversible error: (1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of whether the introduction of extrinsic material substantially and injuriously affected the verdict. *Estrada*, 512 F.3d at 1238; *see also Sassounian v. Roe*, 230 F.3d 1097, 1109 (9th Cir. 2000).

In this case, Rose alleges that the juror was impartial for two different reasons: 1) she committed misconduct by contacting her coworker for further information on the case; and

2) she had been the victim of an undisclosed sexual assault.  Rose first brought his claim on direct appeal, raising only the juror misconduct issue.  The Court of Appeal summarized the facts of that claim as follows:

> During trial, [Presiding Juror] heard the name of [Rose's] girlfriend mentioned and recalled that one of her coworkers had the same maiden name.  She later asked the coworker if her sister had a boyfriend, a baby, or drove an SUV.  The coworker said she did not and the juror dismissed it.  During deliberations, she did not consider that there was any connection or relationship between defendant's girlfriend and her coworker.  The verdicts were returned.
>
> The following week the coworker approached the juror and told her that in fact her sister did have a baby named Rune.  The juror realized that was [Rose's] son's name, but she did not immediately contact the court.  The coworker encouraged her to meet with the defense investigator.  The juror complied.  She then consulted with an attorney, who advised her to contact the trial court.  [Rose] filed a motion for a new trial based on juror misconduct.  The trial court found any "technical" misconduct harmless and denied the motion.

*Rose*, 2010 WL 3048546, at *7-8.

The Court of Appeal subsequently rejected the claim after concluding that the misconduct did not lead to a substantial likelihood of actual juror bias:

> First, this is not a case of a familial relationship as in *Conaway v. Polk* (4th Cir. 2006) 453 F.3d 567, 585-585, the nonbinding federal case upon which [Rose] relies.  Here the relationship was quite attenuated—the sister of one of the juror's coworkers.
>
> Second, there is substantial evidence the juror was not biased at the time of deliberations.  While she inquired about the possibility of a relationship, her coworker initially disabused her of the idea.  And so she went into deliberations unvarnished and unaware of any possible connection.
>
> Third, she did not obtain any extrajudicial information about the facts of the case.  As the Attorney General points out, the sister's involvement was minimal.  She was not accused as a codefendant or accomplice.  The coworker did not provide any information about any of the witnesses, about the events that transpired, or about anything else relating to the case.
>
> Thus, we conclude there is no reasonable probability, let alone a substantial likelihood, that the juror was actually biased against [Rose].  She was unaware of the relationship at the time she deliberated his guilt, the relationship itself was very attenuated, and she obtained no additional information about the case from her conversations with her coworker.  Because [Rose] suffered no actual harm from the

juror's conversation with her coworker, the presumption of prejudice is rebutted and we need not reverse the judgment.

*Id.* at *8.

Rose bolstered this claim on collateral review by including a declaration from a co-worker of Presiding Juror and McNaughton who overheard Presiding Juror talking about a case on which she was serving as a juror and a report summarizing the investigator's conversation with Presiding Juror.

The declaration relates to Rose's contention that the juror committed misconduct based on her discussions with her coworker about the case. The third party declaration, which is sworn, signed and dated four years after the described incident occurred, alleges that Presiding Juror was speaking about the case in a break room, and the declarant "commented that [Presiding Juror] should not be speaking about the case, since she was a juror on the case, and the trial in the case was going on at that time." The declarant did not remember what Presiding Juror said about the case.

Rose's collateral review motion also raised a new issue: whether the juror had failed to disclose that she was a victim of sexual assault. The report, which is unsigned but appears to have been drafted by the head of a private investigative agency, states that Presiding Juror admitted to being raped as a child, which affected her belief regarding eyewitness identifications in the instant case. The report also alleges that Presiding Juror described conversations among jurors during deliberations and comments other jurors had made about witness credibility and their assessments of the evidence. The report also indicates that Presiding Juror admitted to talking with Nicholson at some point during the trial.

-14-

1.    *Outside Research*

With respect to Presiding Juror's conversations with Nicholson and outside research, the Court assumes, as the state appellate court did, that the Presiding Juror committed technical misconduct by her actions.  However, for the reasons thoroughly and persuasively explained by the California Court of Appeal, under the circumstances of this case that misconduct could not have had a substantial and injurious effect or influence in determining the jury's verdict.  Here, Presiding Juror testified before the trial court that she "completely dismissed the phone conversation, came to court on Friday, hearing closing arguments, went into deliberations and never thought about it again."  The trial court found her credible and determined that the extraneous information had no impact on her verdict.

A trial judge's finding that a juror was not biased is a factual finding presumed to be correct because "resolution [of the juror impartiality issue] depends heavily on the trial court's appraisal of witness credibility and demeanor."  *Thompson v. Keohane*, 516 U.S. 99, 111 (1995); *see, e.g.*, *Wainwright v. Witt*, 469 U.S. 412, 428-29 (1985); *Patton v. Yount*, 467 U.S. 1025, 1038 (1984).  The evidence Rose presented on collateral review, which indicated that Presiding Juror admitted to the contact and had some conversation about the case outside of court, fails to rebut the correctness of the trial court's finding.  Importantly, that "extraneous information" received from Nicholson contained no outside information about the event in question.  Indeed, the only information the juror received from Nicholson was the inference that she had a poor opinion of Rose based on her statement that her sister got involved with the wrong kind of men.  Rose is therefore not entitled to federal habeas relief on this claim either.

-15-

2.     *Prior Sexual Assault*

Nor can Rose show juror bias based on the hearsay allegations that Presiding Juror failed

to disclose that she was the victim of a sexual assault.  The hearsay contained in the unsigned,

unsworn investigative report was of insufficient evidentiary value to warrant relief, and indeed,

does not warrant federal habeas relief or an evidentiary hearing on federal habeas review either.

In this case, the investigative report contending that the juror was the victim of sexual assault is

dated April 12, 2008, and indicates that the interview was conducted that same day.  However,

Rose's claim that the juror failed to disclose her prior sexual assault was not raised to the state

courts until Rose filed his second counseled habeas petition in the Superior Court more than four

years later on May 23, 2012.  Notably, the claim was not included in Rose's motion for a new

trial, which was presented to the trial court on August 7, 2008—less than three months after the

interview, and, as previously discussed, thoroughly briefed and argued by the parties and

thoughtfully considered by the trial court.  Had Rose brought his contention to the court at that

time, the trial court was in a much better position to evaluate its accuracy, particularly given that

nearly 7½ years have passed since the interview occurred, and the interview was conducted

before the Presiding Juror testified to the trial court about her contact with Nicholson.

Thus, it cannot be said from this record that the state courts prevented Rose from

developing the factual basis of this claim.  *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1417 n.5

(2011) (Sotomayer, J., dissenting) (assuming that the majority did not intend to preclude an

evidentiary hearing when the petitioner's ability to develop the facts was the fault of the state

court itself).  A district court may not hold an evidentiary hearing on a claim for which a

petitioner failed to develop a factual basis in state court unless the petitioner shows that: (1) the

claim relies either on (a) a new rule of constitutional law that the Supreme Court has made retroactive to cases on collateral review, or (b) a factual predicate that could not have been previously discovered through the exercise of due diligence, and (2) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact finder would have found the petitioner guilty of the underlying offense.  28 U.S.C. § 2254(e)(2).  None of these exceptions are relevant here, and the Court is therefore not authorized to hold an evidentiary hearing on this claim.

Moreover, the vast majority of information contained in the report is inadmissible.  In determining whether a defendant was convicted by a fair and impartial jury, Federal Rule of Evidence 606(b) limits a federal court's consideration of potential jury misconduct.[3]  That rule provides:

> During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

FED. R. EVID. 606(b).[4]

---

[3]  The rationale for this rule is the protection of jury verdicts which "can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering something which might invalidate the finding.  Jurors would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *Tanner v. United States*, 483 U.S. 107, 119-20 (1987) (citations omitted).

[4]  The rule applies an "[e]xception[] . . . for testimony as to 'extraneous prejudicial information' brought to the attention of the jury, an improper 'outside influence' on a juror, or a mistake in completing a jury form."  FED. R. EVID. 606(b).  That exception is discussed, *supra*, with regard to Rose's contention that Presiding Juror improperly sought outside information.

In accordance with this rule, federal courts routinely deny motions for a new trial where such requests are based on juror declarations deemed inadmissible under Rule 606(b).  *See, e.g.*, *United States v. Bussell*, 414 F.3d 1048, 1054-55 (9th Cir. 2005) (agreeing with district court that juror declaration regarding juror speculation that co-defendant had pled guilty were inadmissible under Rule 606(b) and that, therefore, no evidentiary hearing or new trial was warranted); *United States v. Rutherford*, 371 F.3d 634, 640 (9th Cir. 2004) (upholding district court's denial of new trial because Rule 606(b) barred consideration of declarations stating that jurors ignored court's instructions and discussed defendant's failure to testify).

Rule 606(b) also "applies to petitions for habeas corpus from state court prisoners." *Erikson v. Rowland*, 991 F.2d 803, at *2 (9th Cir. 1993) (unpublished).  Thus, federal courts have likewise consistently rejected habeas claims alleging juror misconduct where those claims depend on evidence that would be inadmissible under Rule 606(b).  *See, e.g.*, *id*. at *3; *Harrison v. Gillespie*, 640 F.3d 888, 895 (9th Cir. 2011) (noting, in context of a § 2241 habeas petition, that a Court "may not consider jurors' testimony addressing the jury's deliberative process unless the testimony 'bear[s] on extraneous influences on the deliberation'"); *Estrada*, 512 F.3d at 1237-38 (9th Cir. 2008) (affirming district court's application of Rule 606(b) to bar consideration of certain juror affidavits supporting a § 2254 habeas petitioner's juror misconduct claim).  Because Rose has not presented admissible evidence of the alleged juror misconduct during deliberations, and, indeed, will necessarily be unable to do so given the nature of the alleged misconduct, this claim must also fail on federal habeas review.  Further, even if Rose were able to present admissible evidence, "allegations that relate to 'intrinsic jury processes' do not implicate the protections of the Sixth Amendment."  *See Hernandez v. Barnes*, No. CV 12-

01887, 2015 WL 269050, at *9 (C.D. Cal. Jan. 20, 2015) (citing *United States v. Bagnariol*, 665 F.2d 877, 887 (9th Cir. 1981) ("Intrinsic jury processes will not be examined on appeal and cannot support reversal.")).

Accordingly, Rose fails to demonstrate that he was not afforded a fair and impartial jury, and he is not entitled to relief on this ground.

B.      *Ineffective Assistance (Ground 2)*

Rose additionally alleges that trial counsel was ineffective with regard to the photographic lineup and identification offered at trial.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that

determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Rose must show that defense counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

Rose argues that, because he was the only person in the photographic lineup with a neck tattoo, counsel should have moved to exclude the results of the lineup as suggestive.  He further alleges that, prior to the incident, Quayle obtained a neck tattoo similar to Rose's neck tattoo, and counsel should have procured a recent photograph of Quayle when asking the witnesses if Quayle was the one who had assaulted the victim.  Rose presented these related claims before the state courts on collateral appeal, both of which were summarily denied.

Rose fares no better on federal habeas review.  As an initial matter, California courts have consistently held that a photo array is not unduly suggestive merely because there are differences among the individuals shown in the photographs.  *People v. Blair*, 602 P.2d 738, 751 (Cal. 1979) ("there is no requirement that a defendant in a lineup must be surrounded by people nearly identical in appearance" (citation omitted)); *see People v. Carter*, 117 P.3d 476, 09 (Cal.

2005) (six-pack photo array not unduly suggestive where defendant was the only individual wearing an orange shirt not otherwise identifiable as jail-issued clothing), *supereceded by statute on other grounds as recognized in Verdin v. Superior Court*, 183 P.3d 1250, 1257 (Cal. 2008); *People v. Cunningham*, 25 P.3d 519, 561 (Cal. 2001) (rejecting challenge to photographic lineup where the defendant was the only one of the six men shown who had three of the features noted by the eyewitness—glasses, a goatee, and a suit and tie—where all of the others had glasses and a mustache, some had facial hair, and one wore a suit jacket).

Moreover, the record indicates that two of the witnesses who were shown the allegedly-suggestive lineup did not conclusively identify Rose.  The first claimed to be "50 percent sure," and the second stated, "He just looks like the guy.  I can't say that it is."  Defense counsel was able to use these comments to attack the validity of the identifications, and indeed, stressed throughout trial and closing argument that these two witnesses could not positively identify Rose.  It was not unreasonable for counsel to elect to attack the identification of these two witnesses through cross-examination and argument rather than through a pretrial suppression motion.  Rose has thus failed to overcome the strong presumption that his counsel's decision to use the unsure photographic identification to undermine the witnesses' identification of Rose at trial was a tactical decision which this Court may not second-guess.  *Harrington v. Richter*, 562 U.S. 86, 104 (2011); *Strickland*, 466 U.S. at 690-91.

And Rose's related claim that trial counsel should have offered the witnesses a recent photograph of Quayle's neck tattoo is too speculative to warrant relief.  Rose has provided insufficient evidence to reasonably believe that Rocha, who testified at trial that he was sure that Rose was the attacker, or Krupa, who could not say at trial whether Rose was the attacker, would

have identified Quayle if shown the picture.  Moreover, witness Johnston, who testified that he knew both Rose and Quayle well, testified that Rose wielded the pipe and Quayle was "just standing there with his mouth open, like his eyes really wide like he was frozen."  Rose thus cannot show that he was prejudiced by counsel's failure to introduce a recent photo of Quayle.

V. CONCLUSION AND ORDER

Rose is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: December 14, 2015.

/s/James K. Singleton, Jr.<br>
JAMES K. SINGLETON, JR.<br>
Senior United States District Judge